AMERICAN OIL CO. v. COLONIAL
OIL CO.

No. 4957.

Circuit Court of Appeals, Fourth Circuit.

Aug. 12, 1942.

Writ of Certiorari Denied Nov. 9, 1942.

See —— U.S. ——, 63 S.Ct. 159, 87 L.Ed. ——.

Pinckney L. Cain, of Columbia, S. C., and J. K. Eagan, Jr., of Baltimore, Md. (Thomas, Cain & Black, of Columbia, S. C., on the brief), for appellant.

Claud N. Sapp, of Columbia, S. C., and Thomas M. Boulware, of Barnwell, S. C. (Hugh O. Hanna, of Hampton, S. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The gravamen of the complaint in this case is that on August 13, 1940, American Oil Company, a Maryland corporation, took forcible possession of the premises known as the Palmetto Filling Station in Denmark, South Carolina, in violation of the right of Colonial Oil Company, a Georgia corporation, to occupy and use the station under a valid lease from the owners. Three agreements of lease are alleged to have been made: (1) A written lease of December 13, 1932 for a term of ten years from date at a rental of 1c per gallon of gasoline sold on the premises, payable monthly, executed by J. B. Guess, Sr., the owner of a life estate in the property, who died in February, 1936; (2) an oral lease executed after the death of Guess by the owners of the fee without limitation as to time, at an agreed rental, payable monthly, and (3), an oral lease of like character executed by Denmark Realty Company, a South Carolina corporation, which purchased the property from the owners on January 12, 1937.

Incidental to the forcible seizure of the premises, it is alleged that American removed and laid aside the pumps of Colonial, and installed its own pumps in their stead, and also appropriated three tanks, an air compressor and an automatic lift of Colon-

ial of the aggregate value of $465. These acts took place, it is alleged, after American notified Colonial that it had secured a lease on the premises from the owner and was willing to buy Colonial equipment, and after Colonial had warned American of its prior right and had refused to release the premises or sell its equipment. Damages were claimed in the sum of $110,466, comprising $1 for disturbance of the right of possession, $10,000 for loss of business, $465 for loss of equipment and $100,000 punitive damages.

American's answer asserts that it took possession of the station under a written lease from Denmark and after due notice of its rights and an offer to Colonial to pay for its equipment at a reasonable price. The answer also states that Colonial had no right to the possession of the station.

At the conclusion of the evidence, the defendant made a motion for a directed verdict on the ground that the evidence showed that Colonial did not have any lease or proprietary right in the premises; but this motion was overruled by the District Judge because American had taken possession of and had made use of Colonial equipment on the station, and because there was substantial evidence tending to show that after the death of J. B. Guess, Sr., Colonial remained as a tenant from year to year, and that the current year had not expired when American entered into possession.

The defendant also moved for a directed verdict as to punitive damages. This motion was also overruled as the court was of the opinion that the evidence justified the submission of this question to the jury.

The jury, by its verdict, found for the plaintiff in the sum of $666 actual damages and $5,000 punitive damages. The actual damages seem to have been made up of the value of the equipment appropriated by American in the sum of $465 plus an additional sum for damages in the loss of the business of the station for the balance of the year 1940 during which the Colonial was deprived of its use. The evidence showed that the income from the station was $50 a month. After the verdict was rendered and judgment was entered thereon, the defendant moved the court to set aside the verdict and enter a judgment for the defendant, and thereby secured a review of the legal questions involved. But this motion was overruled for the reasons stated in an opinion of the District Court in Colonial Oil Co. v. American Oil Co., 43 F. Supp. 718.

The evidence tended to show the following situation in support of the plaintiff's case: On December 13, 1932, J. B. Guess, Sr. executed a lease of the premises to Colonial for a term of ten years. Guess had only a life estate in the property, but the agents of Colonial did not know that his estate was so limited. During his lifetime he was paid the stipulated monthly rental for the premises at the rate of 1c per gallon on all the gasoline sold. J. B. Guess, Jr., son of the life tenant, attended to the business for his father, and the rent was paid to the son by crediting his personal account with Colonial for gas and oil sold by it to him individually. After the death of the father in 1936, Colonial remained in possession and continued to pay rent for the premises as theretofore until dispossessed by American in 1940; but no new agreement, written or oral, was made between Colonial and the owners either before or after January 12, 1937, when the Denmark Realty Company acquired the property.

This arrangement continued until July 5, 1940, when American wrote Colonial that after first determining that Colonial had no lease or other agreement of record, it had secured a lease of the station and therefore requested Colonial to sell the equipment it had installed. It was customary in the neighborhood for an oil company taking over a station formerly supplied by another to take over also the latter's equipment at an agreed value, and this was actually done at this time with respect to the equipment at seven or eight other Colonial stations then acquired by American on which Colonial had no lease. In reply to the communication Colonial wrote American on July 19, 1940, that it had a recorded and unexpired lease on the property, and as it did not desire to give up the location, it requested American to respect its rights. Later, Colonial, having employed an attorney, learned that its written lease had expired with the death of J. B. Guess, Sr., but was advised that it was entitled to possession as a tenant from year to year. On August 2, 1940, the attorney telephoned the district manager of American at Charlotte, North Carolina, that Colonial had an oral lease for the balance of the year 1940, and later on the same day confirmed this message with a telegram stating that Colonial had a valid lease and warning American

that it would enter the premises at its own risk and be held responsible for special damages for trespass.

The version of the telephone conversation between representatives of the parties differed. The attorney testified that the district manager said that big oil companies did not recognize oral leases, while the district manager testified that he said that he never heard of a major oil company claiming to hold possession on an oral lease. As a matter of fact, it is now conceded that there never was an oral lease on the premises; and the contention now is that in contemplation of law a lease arose by implication from the circumstances and course of dealings that have been described.

The written lease of July 5, 1940, under which American entered into possession, was executed by Denmark Realty Company for the term of one year at a rental at 1½c per gallon of gasoline and oil sold, payable monthly. The change of the station from one oil company to another had its origin in the dissatisfaction of the manager of Colonial's nearby bulk plant with the compensation paid him for his services and the refusal of Colonial to increase his pay. He approached American's district manager in April, 1940, and negotiations followed. Unwittingly Colonial aided in the progress of the negotiations by notifying its bulk plant manager on June 10, 1940, to withdraw from J. B. Guess, Jr. a concession in price which for some years he had enjoyed on goods purchased for the Palmetto station and two other stations which he controlled, and for a farm, a milk business and a commissary which he conducted. Thereafter the two men cooperated, with the result that Colonial's agent secured a more favorable contract with American; and seven or eight stations, in addition to Palmetto, which had been served from Colonial's bulk station, gave their business to American. Colonial conceded that it had no lease on any of these stations except Palmetto, and in each instance the change was made without controversy and American took over Colonial's equipment at an agreed price.

American did not employ Colonial's bulk plant manager until satisfied that he was not under contract with any one else, and did not take over the Palmetto station until it satisfied itself that no other company had a lease upon it. American's district manager first investigated Colonial's claim that it had an unexpired written lease and later, after the conversation with Colonial's attorney, investigated his claim that Colonial had a valid oral lease. American found, as is now conceded, that both of these claims were incorrect. On the basis of this information American went ahead and entered into possession of the Palmetto station. It was able to do so without disturbing the occupant in charge. This was possible because, according to the uncontradicted testimony, the occupant upon taking charge of the station had made all his arrangements with J. B. Guess, Jr., acting for the Denmark Realty Company, and recognized that company as its landlord. It is conceded that from the beginning in 1932, Colonial left the selection of the operators of the station to J. B. Guess, Jr., although Colonial contends that the occupant in each case became its tenant while it remained the tenant of the owners of the property. There was indeed substantial evidence tending to show that the occupant of Palmetto station was the tenant of the Denmark Realty Company in 1940 and not the tenant of Colonial. Testimony to this effect was given by J. B. Guess, Jr., and also by the occupant of the station, and in addition it was conceded that the method by which the rent for the Palmetto station was collected at the rate of 1c a gallon by Colonial and turned over by it to Denmark Realty Company was the same method used at two other stations which Guess controlled, as to which Colonial claimed no lease. On the other hand, as set out above, there was evidence from which the jury might reasonably have inferred that the relationship of landlord and tenant existed between Denmark Realty Company and Colonial.

Three questions arise upon these facts: (1) Whether the acts of the parties, which occurred after the death of J. B. Guess, Sr., gave rise to the relationship of landlord and tenant, between the owner of the property and Colonial, amounting to a tenancy from year to year, which was still existing in August, 1940 when American entered into possession; (2) whether the action of American in appropriating and making use of Colonial's equipment at the station was an infringement of Colonial's rights; and (3) whether the question of punitive damages should have been submitted to the jury by reason of the actions of American in taking possession of the station and appropriating the equipment to its own use.

76

We are in accord with the opinion of Judge Wyche in the District Court upon the first two questions. The bearing of the evidence upon Colonial's claim of tenancy and the relevant law of South Carolina, as established by the decisions of the Supreme Court of the State, are clearly and succinctly set out in the following extract from the opinion (43 F.Supp. 718, 722):

"There is substantial evidence to sustain the plaintiff's contention that when the written contract with Guess, Sr., terminated by his death in February, 1936, the plaintiff remained a tenant at will of the remainderman, impliedly adopting the stipulation as to payment of rent by the remainderman acquiescing in such payment; that Denmark Realty Company purchased January 12, 1937, with knowledge on its part that the original lease with Guess, Sr., had terminated with his death; that Denmark Realty Company thereafter acquiesced, throughout 1937, 1938, 1939 and part of 1940, in the payment of the same rent in the same manner, from which the jury could find that the relationship of landlord and tenant was impliedly created and that the tenancy was from year to year. The case is bottomed on the implications and inferences arising from the conduct of the parties after January 12, 1937, in the light of the preceding written lease and the preceding tenancy at will under the remainderman. It is true that the evidence is conflicting, but there was sufficient evidence sustaining the contentions of the plaintiff to require the submission of this issue to the jury for trial.

"The law in South Carolina is well settled that where a person remains in possession of premises, with the consent or acquiescence of the owner, for a year or more, after the expiration of his lease, or from the time he entered under a void parole lease, or while a tenant at will, without any express limitation or agreement as to the time for which the premises are to be held, then, if the rent, stipulated by agreement, expressed or implied, is payable, by agreement expressed or implied, and is paid with reference to the divisions of the year (e. g. quarterly or monthly) the tenancy is converted into a tenancy from year to year." (cases cited).

We agree also with the conclusion of the District Judge that the appropriation and use by American of Colonial's equipment was a violation of the latter's strict rights, notwithstanding American's offer to pay the value of the equipment in accordance with the local practice which was followed with respect to all of the other Colonial stations acquired by American at or about the same time. It follows, that the motion of the defendant for a directed verdict was properly denied not only on account of American's use of the equipment, but also because the evidence required the submission to the jury of the issue as to Colonial's tenancy of the station as above set out.

We think, however, that the South Carolina authorities cited in the judge's opinion did not justify the submission of the issue of punitive damages to the jury. The Supreme Court of South Carolina has on more than one occasion quoted with approval the following passage on exemplary or punitive damages from Sutherland on Damages, 3 Ed., Vol. 2, p. 1039, § 393: "If a wrong is done willfully—that is, if a tort is committed deliberately, recklessly or by willful negligence, with a present consciousness of invading another's rights or of exposing him to injury, an undoubted case is presented for exemplary damages * * *. These damages are allowable only when there is misconduct and malice, or what is equivalent thereto. A tort committed by mistake in the assertion of a supposed right, or without any actual wrong intention and without such recklessness or negligence as evinces malice or conscious disregard of the rights of others will not warrant the giving of damages for punishment, where the doctrine of such damage prevails." Gwynn v. Citizens' Telephone Co., 69 S.C. 434, 444, 48 S.E. 460, 67 L.R.A. 111, 104 Am.St.Rep. 819; Darlington County Fair & Driving Ass'n v. Atlantic Coast Line Railroad Co., 90 S.C. 436, 73 S.E. 790.

The burden resting upon one, who has innocently invaded another's right without conscious intention to do so, to relieve himself from liability for punitive damages by showing that he has not acted recklessly or wantonly, is outlined in a number of South Carolina decisions. Thus in Beaudrot v. Southern Ry., 69 S.C. 160, 161, 166, 48 S.E. 106, 107, the court said: "* * * a trespasser, though acting in honest belief of right, might be so grossly negligent in ascertaining his rights that his attempt to make good his claim by force should be regarded a wanton and reckless invasion of the possession of the real owner."

Again, in Anderson v. Atlantic Coast Line R. Co., 179 S.C. 367, 370, 184 S.E. 164, 166, 104 A.L.R. 406, the court quoted with approval from Norris v. Greenville, S. & A. R. Co., 111 S.C. 322, 97 S. E. 848, saying: " * * * not only is the conscious invasion of the rights of another in a wanton, willful, and reckless manner an act of wrong, but also when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary reason and prudence would say that it was a reckless disregard of another's rights."

Again, in a controversy like the present one over the right to the possession of an oil station, Oakman Service Station, Inc., v. People's Oil Co., 174 S.C. 517, 521, 178 S.E. 129, 131, the appellate court quoted with approval the following passage from the opinion of the trial court: "The plaintiff introduced further proof that the defendant, in spite of these warnings and protests, and without making the slightest investigation of its rights in the premises, proceeded without further ado to take over the two stations and to appropriate unto itself the property thereon located, although it seemed probable that if the defendant had inquired into the records in its own main office at Charlotte, North Carolina, it would have ascertained that it was without right to the immediate possession of either station. Under such circumstances, it appears to me that the recovery of punitive damages was properly an issue for the jury (Fredericks v. Commercial Credit Co., 145 S.C. 380, 143 S.E. 179), and I am not inclined to disturb their conclusion with respect thereto."

 Judge Watkins, of the District Court below, summed up the South Carolina rule as to punitive damages for this court in a South Carolina case, Galloway v. General Motors Acceptance Corp., 4 Cir., 106 F.2d 466, 468, as follows: "The real test is whether in taking property in possession of another over his protest, the party so taking it is guilty of such conduct as would tend to create a breach of the peace, or would otherwise show a willful, reckless or wanton disregard of his opponent's rights. It is true that a presumption of willfulness, wantonness or recklessness may arise from the conduct of the tort feasor and the circumstances under which the property is seized, but facts must be shown sufficient to give rise to the presumption. The mere taking of property under a claim of right over the protest of one in possession is not sufficient. Punitive damages are awarded for the purpose of punishing a tort feasor for such an exhibition of recklessness or negligence as evidences malice or the conscious disregard of the rights of others."

 In the light of these authorities, we are satisfied that the evidence in the pending case did not justify the submission of the issue to the jury. A careful examination of the original record fails to disclose any substantial evidence that American or the district manager on its behalf, acted in willful, malicious or reckless disregard of the plaintiff's rights. On the contrary, it is clear that American did not enter into possession until it had made an investigation such as would have satisfied any person of ordinary prudence and reason that entry into the premises was lawful and safe. The trouble was brought about because the agents of Colonial, doubtless with good intent, misinformed and misled American when it was making its investigations preliminary to taking control. First, American was told that Colonial was holding under a valid unexpired written and recorded lease. Investigation showed this to be incorrect. Second, American was told by Colonial's attorney that Colonial had a valid oral lease for the balance of the year 1940. Investigation showed this statement also to be incorrect; and it is now conceded by Colonial that both of the statements made on its behalf were wrong. American, however, was obliged to find this out for itself, and when it did so it was obviously justified in accepting the statements of those in actual physical control of the station that Colonial had no claim upon it.

In this connection it is important to bear in mind that Colonial's attorney in his telephonic and telegraphic messages of August 2 did not warn American that Colonial relied upon a tenancy from year to year. He testified at the trial in the District Court that he held the opinion on August 2 that the holding was from year to year, but he said he told American's district manager merely that Colonial had a valid oral lease for the balance of the year. Since American ascertained that there was no such lease upon the premises, no inference of willful or wrongful intent may be

drawn from the statement attributed to its district manager that big oil companies did not recognize oral leases.

Little need be added in this connection with respect to American's wrongful use of Colonial's equipment. Obviously the gist and burden of the complaint were American's appropriation of the location. Colonial was not interested in the retention of its equipment. On the contrary, it was to its interest to sell the equipment at the Palmetto station, if it had no lease on the premises, as it had done in all of the other stations taken over at the time in conformity with the local practice known to both companies. Colonial's insistence at this time on its rights with respect to the equipment is merely a part and incident of its larger claim as to which no punitive damages are recoverable.

■ Our conclusion is, that the judgment should not stand since it includes an allowance for punitive damages; and therefore the judgment will be reversed and the case remanded for a new trial unless the appellee shall file with the clerk of the District Court within 30 days after the filing of this opinion a remittitur of the amount of the punitive damages separately included in the verdict of the jury. See, Gulf States Creosoting Co. v. Loving, 4 Cir., 120 F.2d 195, 205, and cases cited.

Reversed nisi.